**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____X

**R.C. and M.C.** individually, and on behalf of their child, **R.C.**, a minor,

Plaintiffs,

    -against-

**Garden City Union Free School District**

Defendant.
_____X

**ADMINISTRATIVE REVIEW OF ERRONEOUS STATE REVIEW OFFICER DECISION**

Civ. No. 2:24-cv-8328-LGD

Individuals with Disabilities Education Act;
N.Y. Educ. Law § 4401 *et seq*.


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

LAW OFFICE OF BENJAMIN J. HINERFELD
9 Stoddard Street
  Plymouth, MA 02360

1528 Walnut Street,  Suite 1100
  Philadelphia, PA 19102

447 Broadway 2nd Floor
  New York, NY 10013

Office (508) 591-0385
Cell (215) 694-7432
Fax (215) 689-2423
Ben@hinerfeldlaw.com
*Licensed in MA, PA, NJ, NY, NC & DE (inactive)*

**Table of Contents**

Table of Contents..................................................................................................................ii

Table of Authorities...........................................................................................................iii

Introduction .......................................................................................................................1

IDEA Framework and Standard of Review .....................................................................1

Argument............................................................................................................................5

**POINT 1: The IHO correctly held that the District violated the IDEA's "Child Find" mandate.
The SRO erred factually and legally in overruling the IHO** ...................................5

    a.   The IHO correctly held that the District failed in its affirmative "Child Find"
duty to identify and evaluate R.C. once it suspected that he had a disability .....................5

    b.   The SRO wrongly reversed the IHO's finding of a Child Find violation based
on his misinterpretation of the IDEA's statute of limitations and his failure to
grapple with the IHO's findings. His decision is not entitled to deference. ..................12

    c.   The SRO erred in finding that the District was "diligently proceeding through
the RTI/MTSS structure in fall 2021" and that its use of RTI/MTSS legally
excused it from evaluating R.C for a disability.................................................................16

**POINT 2: The District's Child Find violation was a denial of FAPE that caused R.C.
substantive harm, entitling him to compensatory relief** .....................................18

**POINT 3: The IHO properly held that the District failed to evaluate R.C. properly, resulting
in an improper disability classification and inadequate IEP goals and programming** .....19

    a.   ADHD and Executive Functioning. ...........................................................................20

    b.   The IHO correctly held that the District failed to assess R.C.'s visuo-perceptual deficits
and their impact on his progress. The SRO, without explanation, rejected Parents'
experts' opinions in favor of less specific opinions from the District's witnesses ......................22

    c.   The IHO correctly held that the District failed to evaluate R.C. for learning disabilities
and so failed to offer him appropriate programming. The SRO erred by reversing him ..............26

**POINT 4: The IHO correctly held that the District denied Parents participation in the
decision not to provide compensatory services to R.C. The SRO vacated this
holding with little explanation** ...........................................................................28

Conclusion .......................................................................................................................30

## TABLE OF AUTHORITIES

### CASES

*Amanda J. v. Clark Cty. Sch. Dist.*,
    267 F.3d 877 (9th Cir. 2001) ............................................................................. 5

*Avaras v. Clarkstown Cent. Sch. Dist.*,
    2018 U.S. Dist. LEXIS 169728 (S.D.N.Y. Sept. 28, 2018) ........................... 13, 17

*B.M. v. Pleasantville Union Free Sch. Dist.*,
    2021 U.S. Dist. LEXIS 183330, 2021 WL 4392281 (S.D.N.Y. Sept. 24, 2021) ................................. 2

*B.R. v. N.Y.C. Dep't of Educ.*,
    910 F. Supp. 2d 670 (S.D.N.Y. 2012) .................................................................. 4

*Bd. of Educ. v. C.S.*,
    990 F.3d 152 (2d Cir. 2021) ......................................................................... 4, 12

*Bd. of Educ. v. M.N.*,
    2017 U.S. Dist. LEXIS 169926 (S.D.N.Y. Oct. 13, 2017) .................................... 6

*Bd. of Educ. v. Rowley*,
    458 U.S. 176 (1982) ...................................................................................... 2, 3

*C.L. v. N.Y.C. Dep't of Educ.*,
    2013 U.S. Dist. LEXIS 3474 (S.D.N.Y. Jan. 2, 2013) ............................... 4, 5, 13

*C.L. v. N.Y.C. Dep't of Educ.*,
    552 F. App'x 81 (2d Cir. 2014) .................................................................. 5, 16

*D.S. v. Trumbull Bd. of Educ.*,
    975 F.3d 152 (2d Cir. 2020) ............................................................................. 3

*E.H. v. N.Y.C. Dep't of Educ.*,
    164 F. Supp. 3d 539 (S.D.N.Y. 2016) ......................................................... 28, 29

*Endrew F. v. Douglas Cnty. Sch. Dist.* RE-1.,
    137 S. Ct. 988 (2017) ................................................................................... 2, 3

*Forest Grove Sch. Dist. v. T.A.*,
    557 U.S. 230 (2009) ........................................................................................ 18

*Gagliardo v. Arlington Cen. Sch. Dist.*,
    489 F.3d 105 (2d Cir. 2007) ............................................................................. 4

*Greenwich Bd. of Educ. v. G.M.*,
    2016 U.S. Dist. LEXIS 81008 (D. Conn. June 22, 2016) ................................... 6

*J.S. v. Scarsdale Union Free Sch. Dist.,*
    826 F. Supp. 2d 635 (S.D.N.Y. 2011) ...................................................... 5, 6, 13

*K.R. v. N.Y.C. Dep't of Educ.,*
    107 F. Supp. 3d 295 (S.D.N.Y. 2015) ........................................................ 4

*Lab'y Charter Sch. v. M.R.S.,*
    2024 U.S. App. LEXIS 18172 (3d Cir. July 24, 2024) ...................................... 19

*L.O. v. N.Y.C. Dep't of Educ.,*
    922 F.3d 95 (2d Cir. 2016) .......................................................................... 2

*M.H. v. N.Y.C. Dep't of Educ.,*
    685 F.3d 217 (2d Cir. 2012) ...................................................................... 4, 5

*M.T. v. Arlington Cent. Sch. Dist.,*
    2022 U.S. Dist. LEXIS 205272 (S.D.N.Y. Nov. 9, 2022) ................................... 30

*Mr. A. v. Greenwich Bd. of Educ.,*
    2016 U.S. Dist. LEXIS 94431 (D. Conn. July 21, 2016) .... ......................... 18, 19

*NLRB v. Katz's Delicatessen,*
    80 F.3d 755 (2d Cir. 1996) ........................................................................ 5

*P. v. W. Hartford Bd. of Educ.,*
    885 F.3d 735 (2d Cir. 2018) ........................................................... 5, 13, 18

*R.E. v. N.Y.C. Dep't of Educ.,*
    694 F.3d 167 (2d Cir. 2012) ................................................................. 2, 19

*Reid v. D.C.,*
    401 F.3d 516 (D.C. Cir. 2005) ................................................................ 19

*Scott v. N.Y.C. Dep't of Educ.,*
    6 F. Supp. 3d 424 (S.D.N.Y. 2014) ............................................................ 5

*Sir Speedy, Inc. v. L&P Graphics, Inc.,*
    957 F.2d 1033 (2d Cir. 1992) .................................................................. 13

*Streck v. Bd. of Educ. of the E. Greenbush Cent. Sch. Dist.,*
    408 F. App'x 411 (2d Cir. 2010) .............................................................. 30

*V.A. v. City of N.Y.,*
    2022 U.S. Dist. LEXIS 84556 (E.D.N.Y. May 10, 2022) ................................. 18

*Werner v. Clarkstown Cent. Sch. Dist.,*
    363 F. Supp. 2d 656 (S.D.N.Y. 2005) ......................................................... 2

## STATUTES AND RULES

20 U.S.C. § 1400, *et seq*. (Individuals with Disabilities Education Act) ............................................*passim*

20 U.S.C. § 1401(3)(A)(i) .................................................................................................... .21

20 U.S.C. § 1412(a)(3)(A) .......................................... ......................................................... 4

20 U.S.C. § 1414(a)-(d) .............................................................................................................. 3

20 U.S.C. § 1414(d)(1)(A), (B) ................................................................................................. 3

20 U.S.C. § 1415(f)(3)(E)(ii) ............................................................................................. 2, 19

20 U.S.C. § 1415(i)(2)(C)(iii) ................................................................................................... 4

34 C.F.R. § 300.111(c) .............................................................................................................. 6

8 NYCRR § 100.2(ee)(6) .......................................................................................................... 7

8 NYCRR § 279.8(c)(4) ........................................................................................................... 12

## OTHER MATERIALS

Mem. to State Dirs of Special Educ., 56 IDELR 50 (OSEP 2011) ........................................... 18

SRO No. 24-465 (available at https://www.sro.nysed.gov/decision/2024/24-465) ................................... 18

"Academic Intervention Services: Questions and Answers,"
(available at https://www.nysed.gov/sites/default/files/programs/standards-instruction/
academic-intervention-services-qa.pdf) ...................................................................................... 18

## INTRODUCTION

Plaintiffs R.C. and M.C. (Parents) on behalf of their son, R.C., a child with a disability, appeal the October 31, 2024 Decision of New York State Review Officer (SRO) Justyn Bates, Esq., and ask the Court to reinstate the better reasoned decision of Impartial Hearing Officer (IHO) Richard D. Marsico, Esq. Following a 17-day due process hearing, IHO Marsico issued his detailed and thorough decision, almost entirely in Parents' favor. He held that the Garden City School District (District) violated the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*., and he ordered it to provide relief in the form of reimbursement for out-of-pocket expenses that Parents incurred securing an independent educational evaluation for R.C., as well as compensatory funds to allow them to hire outside tutors for R.C. in reading and math.

The District then appealed to the SRO.  Contrary to the SRO's regulations, the District did not identify any specific errors in the IHO's decision. Nevertheless, the SRO offered his own arguments, making several crucial factual and legal errors in the District's favor. After improperly excluding two years of evidence relevant to R.C.'s timely claims and making improper and unsupported credibility findings contrary to the IHO's findings, the SRO vacated several of the IHO's holdings that were favorable to Parents. This appeal ensued.

## IDEA FRAMEWORK AND STANDARD OF REVIEW

The IDEA guarantees students with disabilities a free appropriate public education (FAPE). Congress enacted the IDEA to ensure that children with disabilities receive a meaningful education and are free of discrimination in their education. It "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *B.M. v. Pleasantville Union Free Sch. Dist.,* 2021 U.S. Dist. LEXIS 183330, *35, 2021 WL

4392281 (S.D.N.Y. September 24, 2021) (quoting *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403-04 (2017)).

The Second Circuit has held that "[i]n determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive." *L.O. v. N.Y.C. Dep't of Educ.*, 922 F.3d 95, 109 (2d Cir. 2016) (quotes omitted). The Second Circuit has explained:

> At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA. Courts then examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits. Substantive inadequacy automatically entitles the parents to reimbursement. Procedural violations, however, only do so if they "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decisionmaking process," or "caused a deprivation of educational benefits." Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not.

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012) (quotes and citations omitted) (quoting, *inter alia*, 20 U.S.C. § 1415(f)(3)(E)(ii); *Bd. of Educ. v. Row*ley, 458 U.S. 176, 207 (1982); *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)).

The Individualized Educational Program (IEP) is "the centerpiece of the statute's education delivery system for disabled children." *Endrew F.*, 280 U.S. at 391. Schools must take specific steps and include detailed data to create an IEP. The *Endrew F.* court explained:

> The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child. The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged.
>
> The IEP must also describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general

education curriculum."

580 U.S. at 391 (citing §1414(d)(1)(A), (B), *Rowley*, 458 U.S. at 181).

To ensure that IEPs are effective, the IDEA requires schools to do fulsome evaluations, following specific procedures as the Second Circuit recently held:

> A child's IEP is based in significant part on the results of statutorily mandated evaluations of the child. Under the IDEA, a child with a suspected disability must receive a "full and individual initial evaluation" to determine the existence and extent of their disability and whether they are entitled to special education and related services under the Act.

*D.S. v. Trumbull Bd. of Edu*c., 975 F.3d 152, 157 (2d Cir. 2020) (quoting 20 U.S.C. §§ 1414(a)-(d)). "In conducting these evaluations, a school must 'use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information,' and the school must assess the child in all areas of suspected disability.'" *D.S.*, 975 F.3d at 157. The *Endrew F.* court explained that an IEP *requires* fulsome, accurate information about the disabled child, and must articulate a detailed plan that, if followed properly, will give the child the best chance at making real and meaningful progress. It emphasized the "individualized" nature of IEPs: "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." 580 U.S. at 400.

Where a school fails to provide their child a FAPE, parents may file an administrative "Due Process" action before a state-appointed IHO. The case is then litigated in a due process hearing (a bench trial). The *Endrew F.* court stated that, by the time of a hearing, a district should "be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." 580 U.S. at 404. This expectation is heightened in New York, where, unlike many states, school districts have the affirmative burden to prove that they have offered a child a FAPE in response to a parent's

Due Process complaint. IHOs have broad powers to fashion appropriate relief on finding an IDEA violation. *Gagliardo v. Arlington Cen. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).

New York has a "two-tiered" due process system. After an IHO issues an FOFD, an aggrieved party may appeal to SRO. The SRO operates like an appellate court in that it seldom admits additional evidence and virtually never hears live testimony. During SRO appeals, a school district retains the burden to prove that it offered a child FAPE. The SRO may not give parents the burden to prove that the district's program was inadequate. *B.R. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670, 678 (S.D.N.Y. 2012).

A party aggrieved by the SRO's decision may file an original action challenging that decision. Courts reviewing SRO decisions must make decisions independently, based "on the preponderance of the evidence." 20 U.S.C. §1415(i)(2)(C)(iii). An SRO's legal conclusions are reviewed *de novo* and entitled to no deference. *Bd. of Educ. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021). Courts must nevertheless give the SRO's decision "due weight." *C.L. v. N.Y.C. Dep't of Educ.*, 2013 U.S. Dist. LEXIS 3474, at *12 (S.D.N.Y. Jan. 2, 2013). This deference hinges "on the kinds of considerations that normally determine whether any particular judgment is persuasive." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (internal citations omitted). Different categories of analysis by the SRO merit greater and lesser deference:

- *More deference* when the SRO has greater familiarity with the evidence and witnesses than the court and when it makes decisions about an IEP's educational methodology and substantive adequacy. *M.H.*, 685 F.3d at 243-44.

- *Little deference* when the SRO interprets objective indications of progress. *M.H.*, 685 F.3d at 244, or challenges the IHO's findings by citing documents that lack foundation or testimonial corroboration. *K.R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 308 (S.D.N.Y. 2015).

- *No deference* when the SRO when substitutes its credibility assessments for the IHO's. *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 888 (9th Cir. 2001); when it decides whether a district has complied with the IDEA's procedures, *Scott v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 444 (S.D.N.Y. 2014); or when it fails "to grapple with" evidence

4

contrary to its own findings of fact. *C.L. v. N. Y. C. Dep't of Educ.*, 2013 U.S. Dist. LEXIS 3474, \*20-21 (S.D.N.Y. Jan. 3, 2013.

The IHO's credibility findings are presumptively correct; courts and SROs owe them substantial deference. *Amanda J.,* 267 F.3d at 888 ("We… agree with… [the Second Circuit] that when an SRO overturns the credibility determinations of an [IHO], due weight to the decision of the SRO is not warranted.…"). Deference extends to an IHO's implicit credibility findings – *i.e.*, any finding "that depends upon an implicit determination that credits one witness's testimony as being truthful, or implicitly discredits another's." *NLRB v. Katz's Delicatessen*, 80 F.3d 755, 765 (2d Cir. 1996) (cites omitted). Reviewing courts also examine whether the IHO's or SRO's decision is better reasoned. *C.L.*, 552 F. App'x at 82 (quoting *M.H.*, 685 F.3d at 246).

## ARGUMENT

### POINT 1
**The IHO correctly held that the District violated the IDEA's "Child Find" mandate. The SRO erred factually and legally in overruling the IHO.**

#### a.  The IHO correctly held that the District failed in its affirmative "Child Find" duty to identify and evaluate R.C. once it suspected that he had a disability.

"Child Find" is a school's affirmative duty to *identify*, *locate*, and *evaluate* all children who are suspected of having a disability and in need of special education. 20 U.S.C. § 1412(a)(3)(A). A Child Find violation has occurred when "school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *P. v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 750 (2d Cir. 2018) (quotes omitted).  The school's duty is "'triggered' when it 'has a reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability.'"  *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 660 (S.D.N.Y. 2011) (quotes omitted). "It is not a requirement that parents request an evaluation—a district's Child Find obligation is an affirmative one." *Bd. of Educ. v. M.N.*, 2017 U.S. Dist. LEXIS 169926, \*20 (S.D.N.Y. Oct. 13,

2017).   Child Find operates even if a child is "advancing from grade to grade." 34 C.F.R. § 300.111(c). Crucially, "***[i]f a school district does not evaluate the child within a reasonable time, it necessarily fails to provide that student a FAPE***." *Greenwich Bd. of Educ. v. G.M.*, 2016 U.S. Dist. LEXIS 81008, at *24 (D. Conn. June 22, 2016) (emphasis added) (cites omitted).

The District failed to act despite signs that R.C. had disabilities, leaving R.C., practically speaking, with no IEP until third grade. The IHO correctly held that the District ignored "clear signs" that R.C. had disabilities, signs that triggered its duty to evaluate R.C. I-41-48. This was a Child Find violation. And it caused R.C. sufficient substantive harm that it was a denial of FAPE, entitling him to compensatory relief.  I-52. The SRO erred factually and legally in reversing the IHO's holding.   The evidence supporting this holding can be broken down by academic year:

### Kindergarten (2019-2020)

R.C. began showing obvious signs of disability in kindergarten. After testifying on direct exam that R.C.'s class performance was "right in the middle," T2159:3-16;[1] his teacher, Ms. Palladino, conceded on cross that, despite hard work, R.C. needed significant support to keep up:

> He needed a lot of reinforcement. Like, the sight words I think were, like, you know, a challenge. He needed to have a lot of practice with the sight words. Like I said, we would butter them up every single day.  But I'm sure that wasn't just enough. I'm sure that he was going home and his mother probably had the flashcards, and she was just doing everything, you know, to get him to learn those words. And he was learning the words that I [was] sending home, but it probably took a lot.

T2194:13-25. She shared her concerns with R.C.'s mother (M.C.), but advised her to resist the impulse to compare R.C. to his sister (in her class a few years earlier), who had "soared." T2191:21-2192:15. Three years into her retirement, Palladino still recalled R.C.'s struggles: R.C.'s

---

[1] Citations are as follows: **T-** trial transcripts; **PE** - Parent exhibits; **DE** - District exhibits; **SD** - SRO decision; **I** – IHO decisions; **P** - Parties' SRO pleadings; **S** - supplemental documents; **IE** – IHO exhibits; **CO** - Correspondence.

handwriting was so problematic that she sought help from a push-in occupational therapist (OT). T2162:6-7.   (There are no written records of R.C.'s work with that OT.)   And at the end of kindergarten, she placed R.C. among 5 of 19 children who needed Academic Intervention Support (AIS) for reading. DE506 (Ex. 52-1); T2196, T2214:14-22. Contrary to New York regulations[2] and District policy,[3] no one told Parents that R.C. had needed AIS support.[4] T2713:11-2714:5. This communication failure continued into first and second grades. Only through this litigation did Parents learn that R.C. qualified for AIS reading support as early as kindergarten.

### First Grade (2020-2021)

In first grade, R.C. exhibited clear signs of disabilities in reading, writing and executive functioning. District employees saw these signs but never told Parents the degree to which he was struggling or evaluated him for a disability. Like Ms. Palladino, first grade teacher Kerri Connelly testified on direct to R.C.'s overall success, asserting that his reading was "where we wanted to see him." T2012:9-23. On cross, she conceded that R.C. had struggled in reading. Interpreting an internal document (DE 495-500, Dist. Ex. 50), Connelly confirmed that R.C.'s scores on the *Fundations* reading program were "pretty far below the class average" and that this concerning information was left out of his report card. T2029:7-16; T2036:16-25; DE183; DE497-99. She confirmed that, by early 2021, R.C. was not absorbing and applying *Fundations* lessons (an observation echoed a year later by his second-grade teacher). T2027:21-2028:24. She testified that sometime between December 2020 and February 2021, R.C. began receiving building-level AIS supports in reading. T2050:11-2051:24. Again, Parents were not told. Given that AIS involves a

---

[2] *See, e.g.,* 8 NYCRR § 100.2(ee)(6). AIS is not special education.
[3] PE834 (Ex. DDD) (GCSD Policy 4325 Academic Intervention Services).
[4]This fact conclusively refutes Dr. Kelly Spagnola's implausible testimony, discussed below, that R.C.'s reading difficulties were not "on the radar" until Spring 2022, two years after his kindergarten teacher recommended that he receive AIS reading support.

team decision, it follows that the District was aware of R.C.'s reading difficulties by this time. R.C. also performed poorly on a "High Frequency Words" assessment. T2031:3-2032:9; DE496.

Connelly took note of R.C.'s very bad handwriting; like Palladino, she asked for help from an OT. T2016:11-23. These interventions were not individualized. T2059:4-9. On direct examination, she said that these OT interventions helped R.C., T2017:10-19. On cross she could not remember any specific improvements. T2053:3-14; T2055:15-23. In fact, not realizing she was looking at R.C.'s *third grade* writing, she said that she would ask for OT support because it showed weaknesses. T2053:15-2055:10; PE888, 921; PE545; DE381; DE352. When asked if this third-grade sample showed progress from first grade she answered: "I don't recall." T2055:11-18.

On March 10, 2021 – a pivotal moment – Connelly emailed M.C. to discuss R.C.'s poor hand strength. PE359. When M.C. asked whether R.C. needed formal OT, Connelly responded: "My understanding is that special education is designed for students who have educational disabilities. ***I don't see a disability, but a weakness is evident…***." PE358 (emphasis added). The IHO held: "In so stating, Ms. Connelly misstated the child-find standard and a school district's responsibility. The child-find responsibility is not triggered because the child has a disability, but when there are clear [signs] that the child has a disability—as there were here—and when it would be negligent not to evaluate the child or there is no rational basis not to evaluate a child." I-43.

Parents' expert Dr. Erin McDonough, whom the IHO expressly found credible (I-52), testified that Connelly – a teacher not trained to identify a learning disability (T2050:11-15) – could not rule out a disability without R.C. first being evaluated. T2617:9-20. Looking at the same writing Connelley saw in first grade, McDonough identified clear signs of a writing disability: lack of planning, phonetic spelling, irregular letter formation, inconsistent and incorrect capitalization,

missing letters, and inconsistent pressure.[5] T2609:2-2613:6; PE888-922.  She testified that the document "makes me very suspicious of a problem with orthography and a potential writing disability" – one of the disabilities she subsequently diagnosed for R.C. T2613:7-21.

Reviewing all these records and observing the witnesses' demeanor and testimony, the IHO concluded that the District ignored clear signs of R.C.'s disabilities throughout kindergarten and first grade: I-43. As discussed below, the SRO erroneously excluded all this evidence from his analysis and therefore never properly assessed whether the District violated its Child Find duty.

## Second Grade (2021-2022)

In second grade, R.C. continued exhibiting clear signs of disabilities. He had moved from the Homestead School to Stratford Elementary. Unfortunately, no data from Homestead came to Stratford with him. Therefore, while he quickly exhibited the same signs of disabilities he had shown at Homestead, Stratford's teachers and administrators had no context for them.  R.C. was a clean slate. This communication failure is salient because it refutes the District's (and SRO's) story that, since kindergarten, it had "diligently" tracked R.C. through its "MTSS" framework.

Second-grade teacher Lindsey Bleistein was the frontline employee for the District's Child Find duties towards R.C.  She was unprepared. In only her second year of teaching, she recalled having taken no classes on special education law, the IDEA or IEPs either in college or in her master's program.  T815:23-816:14.[6] She recalled virtually no training on the District's MTSS framework. T824:14-825:2. She also testified that because R.C. did not have an IEP, she did not talk to Ms. Connelly or anyone at Homestead about him.  T822:22-823:14. She did not know about his poor performance on *Fundations* tests in first grade. T827:6-19. Nevertheless, Bleistein quickly

---

[5] Second-grade teacher Lindsay Bleistein identified many of the same issues. DE195.
[6] Bleistein said "I don't recall" or "I don't know" over 200 times. It was the District's burden to prove it met R.C.'s needs.  It did not meet that burden by relying on Bleistein, who had a surprisingly poor recollection of R.C.

recognized signs of R.C.'s disabilities. On September 21, 2021, just weeks into second grade, she emailed Stratford's Principal, Christopher Hartigan, a Google document listing R.C. as needing support in math *and* reading. PE337. On October 8, Parents received a form letter from Hartigan notifying them, for the first time, that R.C. would receive MTSS support in math, but not reading. DE437 (Ex. 46).[7]

As second grade progressed, Parents grew concerned about R.C.'s reading. T2772:22-2773:17. On October 18, M.C. emailed Bleistein asking to discuss R.C.'s reading, writing and math. PE340 (Ex. KK-7). Bleistein responded: "I was just about to email you the same thing." PE339.  They met twice.  Both times, Bleistein nodded in agreement when Parents raised concerns about R.C.'s reading. T2781:23-2782:7; T2844:17-2845:1. Bleistein agreed that R.C. should be referred for special education, but never followed up on Parents' concerns. T2847:7-2848:6.

Meanwhile, R.C. continued to struggle on *Fundations* tests, even with the help of a "word wall" that gave students answers to the test questions.[8] As the IHO held: "Student could check with Ms. Bleistein on any aspect of his answers to the questions on the tests or review a word wall with the answers. As a result, I give little credence to the usefulness of these scores in understanding Student's learning profile."  I-44 n.34 (citing PE233-43); T510-11; T2854:9-16).[9]

On December 1, 2021, Bleistein emailed a school administrator requesting that R.C. be on the agenda for a January 5, 2021 MTSS "initial meeting." PE341.[10] Thus, by the end of 2021, R.C.'s kindergarten, first grade, and second grade teachers, along with school administrators, had

---

[7] MTSS stands for "multi-tiered system of supports," a *general education* framework for schools to screen for students who are struggling and to provide them increasing levels of support. *It is not special education*.

[8] Ms. Connelly confirmed that R.C. had access to the word wall in first grade as well. T2033:17-2034:12.

[9] Even inflated, the *Fundations* results still showed R.C.'s significant struggles over time. The SRO relied on R.C.'s *Fundations* scores as evidence of success, ignoring that they were inflated and unreliable, and often simply *low*. SD16.

[10] The District produced no documentary evidence proving that any MTSS meeting happened.

all seen unmistakable signs – red flags – that R.C. had reading, writing, math, and social-emotional disabilities. Despite these signs, no one acted to begin the IDEA evaluation process.

When the District finally evaluated R.C. in Spring 2022, it revealed that he was struggling for all of second grade. The IHO cited questionnaires Bleistein completed for the evaluation in which she "endorsed higher than typical concerns in all domains except defiance/aggression." I-20 (citing DE70).  Bleistein circled *"always"* to indicate that R.C., among other things, was always – getting failing grades; having problems with math; having trouble keeping up in class; performing poorly on assignments; making careless mistakes; nervous; confused; unclear presenting ideas; and having trouble making friends. I-20 (citing PE248-49; T968-71). Bleistein confirmed that R.C. exhibited these signs and behaviors all year. T957:18-22. These candid, contemporaneous questionnaire answers, completed 14 months before litigation started, cannot be squared with Bleistein's direct testimony that R.C. "was able to access second grade material and everything appropriately" and was "right on target" in reading and math. T806:5-807:25.

Leading up to the May 19, 2022 initial eligibility meeting, District personnel made statements to Parents showing their knowledge that R.C. was struggling: R.C. "definitely presents as someone who has needs," S10 (¶ 92), had clear areas of need "since day one," (*id*. ¶ 89), did not know reading rules (*id*. ¶ 86), lacked foundational skills, seemed "disconnected" throughout the day, and definitely had "something there" deserving support (S11, ¶ 104), had gaps to close (*id*. ¶ 106), had "pockets [of] some skills that he should've had at [that] point," (S12, ¶ 111), had been "obviously…compensating for quite some time" in reading (*id*. ¶ 112), and had "foundational reading skills that are missing," (*id*. ¶ 114). OT Paige Franco went further, telling Parents that R.C.'s motor difficulties were "*intrinsic [difficulties] that were either never addressed or he just*

11

*didn't learn the right strategies for it*" and that she "*was seeing his difficulties in school* and *could clearly see where his difficulties were in observing his writing*." (S9, ¶ 78).

These and many other facts from kindergarten, first grade, and second grade prove that, *objectively*, R.C. was struggling across academic and social-emotional-behavioral domains, and, *subjectively*, the District saw his struggles but failed to act in time. The District's claim that R.C. "was simply not exhibiting noticeable difficulties in school that would have indicated the need for special education services" (P10, P35, P121, S105) disregards clear documentary evidence and testimony showing years of all-encompassing difficulties. Based on this information, the IHO correctly held that the District was negligent in failing to evaluate R.C. for disabilities sooner. I44.

> **b. The SRO wrongly reversed the IHO's finding of a Child Find violation based on his misinterpretation of the IDEA's statute of limitations and his failure to grapple with the IHO's findings. His decision is not entitled to deference.**

The SRO wrongly reversed the IHO's Child Find holding.  His error stems in large part from his misapplication of the IDEA's statute of limitations (SOL). He excluded all evidence from before June 20, 2021 (kindergarten and first grade) from his analysis, writing: "[I]n finding that the parents' claims prior to June 20, 2021 were barred by the applicable statute of limitations, the parents' child-find claims relating to the 2019-20 and 2020-21 school years are precluded ***and will not be further discussed***."  SD14 (emphasis added). And his subsequent Child Find analysis for 2021-2022 did not consider any evidence from kindergarten or first grade. The Court owes no deference to this erroneous conclusion of law. *C.S.*, 990 F.3d at 165.

The Court should reverse this evidentiary holding. *First,* the District never moved to exclude evidence from kindergarten and first grade, abandoning that issue.[11] To the contrary, it has repeatedly cited such evidence to argue that its Child Find duties were never triggered. *Second*,

---

[11] NYCRR § 279.8(c)(4) ("[A]ny issue not identified in a party's request for review, answer, or answer with cross-appeal shall be deemed abandoned and will not be addressed by a State Review Officer.").

even if the District had moved to exclude evidence from kindergarten and first grade on SOL grounds, the argument is wrong. Courts are clear that the SOL bars untimely *claims*, not evidence. *P. v. W. Hartford*, 885 F.3d at 750 ("[B]ecause of the two-year limitations period for IDEA claims, [e]vents preceding March 24, 2012 are untimely ***but may provide evidence of a child-find violation from March 24, 2012 through June 11, 2012, when [M.P] was deemed eligible for special education***.") (Emphasis added).[12] Nor would a rule excluding pre-violation evidence make sense because a court must "focus on what the District knew and when." *J.S.*, 826 F. Supp. 2d at 662.

*Next,* after wrongly excluding all evidence from kindergarten and first grade, the SRO gave an unsupportable narrative of R.C. making progress in second grade, perhaps to show that there were not enough signs of his disability in second grade to trigger the District's Child Find obligation. SD16-20.  But in doing so, he again made significant factual and legal errors. At the most basic level, he did not grapple with the IHO's well-sourced findings about R.C.'s academic experience, which were in direct conflict with his own. A decision that disregards or fails to grapple with inconsistent evidence is not well-reasoned. *C.L.*., 2013 U.S. Dist. LEXIS 3474, at *20-21 ("Whether the SRO impermissibly reversed the IHO's credibility determinations (as plaintiffs claim) or merely weighed the evidence and came to a different conclusion (as the Department claims***), the critical fact remains that the SRO did not grapple with contrary evidence and gave no explanation for why***….") (emphasis added).

For example, he relied on a 2-page Spring 2022 report card to conclude that, in second grade, R.C. "was meeting standards in several areas [sic] approaching standards in others." SD19

---

[12]*See Avaras*, 2018 U.S. Dist. LEXIS 169728, at *26 ("Though any claims Plaintiff attempts to present regarding … the 2010-2011 school year (kindergarten) are likely untimely… the events regarding his RTI services provided that year may nevertheless illuminate whether the District violated its Child Find obligation.") (Citing *P. v. W. Hartford,* 885 F.3d at 750). *See also Sir Speedy, Inc. V. L&P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992).

(citing DE185-86). But he ignored overwhelming evidence – including Ms. Bleistein's candid and alarming questionnaire answers, discussed above – that refuted this report card. *See* I-17 (citing DE104, 108) (listing Bleistein's observations about R.C.'s difficulties). He ignored Bleistein's report to District psychologist, Danielle Warnke, that R.C.'s reading comprehension, math concepts/applications and written language were all "below expectations." PE186 (Ex. CC-4). *Id*.[13]  He ignored that Bleistein told Warnke: "[R.C.] requires accommodations throughout the day to successfully access the general education curriculum," DE65, a perfect description of a child who needed an IEP.[14]

He disregarded much more evidence undercutting his narrative that R.C. was doing well in second grade.  In March 2022, Ms. Bleistein wrote that R.C.'s "recent reading comprehension" scores were 50% and 67%, and that he was reading Level L books at a "frustration" level. DE195 (Ex. 22-4-5). And in words strikingly similar to Ms. Connelly's testimony about R.C. in first grade, Bleistein said that R.C. was "not applying current Fundations knowledge." *Id*.; *See* T2028:17-24 (Connelly: "[T]he skills that were being taught in Fundations at that time he was having a hard time with… [H]e wasn't applying all of the skills that were being taught at that time."). Because he didn't consider evidence from kindergarten and first grade in his Child Find analysis, the SRO did not connect these dots.

He also ignored that, in advance of R.C.'s May 19, 2022 initial eligibility meeting, Ms. Bleistein prepared a 38-page packet of writing samples from R.C. and his classmates, which she used to demonstrate R.C.'s poor writing compared to his classmates. T963:25-964:19; PE327-

---

[13] Warnke confirmed that she had recorded *Bleistein's* answers in this document. T1495:5-18. The SRO oddly misattributed Bleistein's responses to R.C.'s parents. SD19.

[14] This observation is also highly relevant to the Court's Child Find analysis: It was not possible that Bleistein realized that R.C. needed numerous accommodations "to successfully access the general education curriculum," but did not at least *suspect* that he had one or more disabilities. Likely due to her inexperience and complete lack of training on special education (and MTSS), she did not recognize that she was legally required to refer R.C. for an evaluation.

332.[15] She highlighted an illustrated, three-page, step-by-step guide to building a sandcastle from one of R.C.'s classmates, replete with a cover page, table of contents and headers. PE327-31. By contrast, R.C. produced a one-page document containing a run-on sentence and three crude illustrations. PE332. Bleistein explained to the team: "Yes, it's interesting… This was his whole book. He decided he was finished. He didn't want to make a cover page. Typically, 2nd graders at this level are writing three or four pages and adding some kind of text features."  PE722:17-723:6. This was a candid, contemporaneous admission – without the pressures of litigation – that R.C. could not write independently. She was then the third teacher who saw R.C.'s undeveloped reading, writing, spelling and fine motor skills.  Her detailed presentation calls into question her testimony, a little more than year later, where she claimed not to recall R.C.'s writing: "Writing. I -- to be honest with you, I don't really remember. I don't think we have any writing exhibits on there in this documentation binder. So I don't really remember." T592:25-593:8.[16]

The SRO also ignored R.C.'s Spring 2022 performance on the standardized Woodcock Johnson Test of Achievement, Fourth Edition (WJ-IV) and that test's "Relative Proficiency Index" (RPI) report.  The RPI report showed that R.C. would find it "difficult" to do grade-level work in, among many other areas, basic reading skills, reading fluency, and reading rate.  I-18 (citing PE165-68). He would also find it "difficult," "very difficult" or "extremely difficult" to do grade level work various math competencies. *Id*.  Elona Roth, whom the District called to specifically explain R.C.'s WJ-IV results, after testifying on direct that she had "no concerns" about the bulk of R.C.'s test scores, conceded on cross that the RPI report showed that R.C. would find most

---

[15]In addition to this specific comparison, Parents respectfully ask the Court to review R.C.'s writing samples, which demonstrate his disability far more effectively than does any cold description. *See* PE232-43 (Ex. FF); PE295-332 (Ex. JJ); PE394-99 (Ex. LL); PE491-502 (Ex. OO); PE519-54, PE558-68 (Ex. PP); PE570-86 (Ex. QQ); PE848-65 (Ex. GGG); PE866-922 (Ex. HHH); DE 364-91 (Dist. Ex. 38).

[16] Moments earlier, she testified: "I highly value writing, because of my background, so if I can get close to an hour in of writing instruction and writing time, that -- that's a great portion of my day." T550:9-13.

academic tasks "difficult," "very difficult" or "extremely difficult." T539:8-546:10. The SRO did not grapple with these alarming RPI report scores. Instead, he cherrypicked "average" scores, SD23 (citing PE167), missing that the point of the RPI report was to interpret those scores.[17]

The SRO's failure to grapple with overwhelming evidence that R.C. needed significant assistance just to access his education in second grade undercuts his Child Find analysis. The Court should defer to the IHO's more careful, precise, and thorough decision. *C.L.*, 552 F. App'x at 82.

###   c.   The SRO erred in finding that the District was "diligently proceeding through the RTI/MTSS structure in fall 2021" and that its use of RTI/MTSS legally excused it from evaluating R.C for a disability.

The SRO's Child Find ruling is flawed in another critical respect. Despite clear evidence to the contrary, he held that the District was "diligently proceeding through the RTI/MTSS structure in fall 2021" and therefore did not have to "shortchange" that process "and jump all the way to an initial CSE eligibility determination in the first trimester." SD19-20. This assertion is wrong factually and legally. The District's 2021-2024 "MTSS Plan" explains that MTSS includes: (1) "universal screening" for all students; (2) increasing levels of targeted support for students who struggle; (3) integrated plans that address students' unique needs; and (4) data to inform instructional decisions. PE813. There is no evidence that R.C. was ever screened for difficulties in reading, writing or social/emotional issues, that there was any "targeted support" for him, or that there was any integrated plan addressing his unique needs in these areas. There is also no MTSS data; however, even if Stratford Elementary took data (it did not), it never reviewed prior cumulative kindergarten and first grade data from Homestead school, preventing a clear view of R.C.'s "struggles" and hampering any assessment of "targeted supports." T227:11-14.

---

[17] R.C. scored of 82 or lower on 27 of 38 RPI clusters/tests, indicating skills that would be difficult, very difficult or extremely difficult. PE165-66, 168.  And he did not score 95 or higher – the range indicating a task should be easy – on any of the 38 clusters/tests.

There are other critical flaws in the SRO's finding on MTSS. Parents received no communication about MTSS for reading, writing or social/emotional issues, despite each being a clear area of potential disability. Ms. Bleistein recalled no real training or education on MTSS. T650:5-13. CSE Chairperson Dr. Kelly Spagnola testified that by May of 2022, R.C. "wasn't on the radar for [AIS] in the area of reading." T206:16-207:4; T217:10-12. And records from Spring 2022 confirm that R.C. was not in the District's MTSS system (RTI/AIS) for reading, writing, speech, or behavioral support. PE185. There was no "integrated plan."

In fact, the District has never argued that it used MTSS to screen R.C. for any domain except math. *See* S75 and n.1. To the contrary, it has argued that, as a matter of law, it could not classify R.C. with a learning disability in May 2022 because he had not gone through MTSS – "the data available was not enough to support a classification of a learning disability at that time." S83 (citing T132-35, T186-87). It would be completely inconsistent for the District to argue both that it was using MTSS to screen R.C. for learning disabilities, and also that it could not identify him with a learning disability because it had not screened him through MTSS and he was not even "on the radar" for reading difficulties. The SRO had no basis to find that the District was "diligently proceeding" through the MTSS process.

Even if the District was proceeding diligently with MTSS, it was not permitted to delay evaluating R.C. In *Avaras v. Clarkstown Central School District*, 2018 U.S. Dist. LEXIS 169728, *24-29 (S.D.N.Y. Sept. 28, 2018), the court noted that the district *did* provide the student Response to Intervention (RTI)[18] services in kindergarten and first grade, but cited these services to permit delay in evaluating for a disability. *Id.* at *26. Finding this delay impermissible, the court held:

> [T]he law is clear: the Child Find obligation "extends to all children suspected of having a disability requiring special education, 'even though they are advancing from grade to grade,'" and a "school district must begin the evaluation process

---

[18]RTI is the programmatic part of the MTSS framework. *See* T132-33.

within a reasonable time after the district is on notice of a likely disability," That did not occur here. Instead, the District provided RTI services for N.A. for the majority of both his kindergarten and first grade years, apparently believing that his ability to "advance from grade to grade" was sufficient an excuse not to refer him for evaluation. The weight of the evidence demonstrates that the District violated its Child Find obligation.

*Id.* at \*26-27 (quoting *P. v. W. Hartford*, 885 F.3d at 749).[19] The same reasoning applies here with more force, as the District never truly implemented the MTSS process for R.C. – despite its internally inconsistent claims.

Ultimately, as the IHO concluded, the District failed to "find" R.C., and thus failed to create an IEP for him in second grade.  As noted above, "[i]f a school district does not evaluate the child within a reasonable time, it necessarily fails to provide that student a FAPE." *G.M.*, 2016 U.S. Dist. LEXIS 81008, at \*24.  Parents ask the Court to find that the District violated its Child Find obligations, and to reinstate the IHO's decision.

### POINT 2

### The District's Child Find violation was a denial of FAPE that caused R.C. substantive harm, entitling him to compensatory relief.

The District's Child Find violation delayed its provision of an IEP until late May of 2022, well after signs were clear that that R.C. needed special education services.  The Second Circuit has held that "[w]hen a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide an adequate IEP." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015) (citing *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 238-39 (2009); *V.A. v. City of N.Y.*, 2022

---

[19] *See also G.M.,* 2016 U.S. Dist. LEXIS 81008, at \*37; SRO No. 24-465 (citing *Mem. to State Dirs of Special Educ.,* 56 IDELR 50 (OSEP 2011)), available at https://www.sro.nysed.gov/decision/2024/24-465.  According to New York State guidance, AIS services are provided in addition to, and must not supplant, special education services. *See* "Academic    Intervention    Services:    Questions    and    Answers,"    at    5,    available    at https://www.nysed.gov/sites/default/files/programs/standards-instruction/academic-intervention-services-qa.pdf).

U.S. Dist. LEXIS 84556, at *14 (E.D.N.Y. May 10, 2022) (same) (citing *Doe*, *id*); *Mr. A. v. Greenwich Bd. of Educ.*, 2016 U.S. Dist. LEXIS 94431, at *28 (D. Conn. July 21, 2016) ("Where a school board fails to have an IEP in effect for a disabled child at the beginning of the school year, the board fails to offer that student a FAPE.") (citing *Doe*, 790 F.3d at 450).[20]

Some courts have labeled Child Find violations "procedural violations." As noted above, a procedural violation constitutes a denial of FAPE where it "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii)(I)-(III) (quoted by *R.E.*, 694 F.3d at 190). Here, the IHO expressly held that the District's failure to provide R.C. any IEP whatsoever deprived him of educational benefits because his "visuospatial deficits were having a significant impact on his reading, writing and math performance." I-52. He was therefore entitled to compensatory education, specifically to remediate the Child Find violation. that would put him "in the same position they would have occupied but for the school district's violation of the IDEA." *Id*. (Quoting *Reid v. D.C.*, 401 F.3d 516, 523-34 (D.C. Cir. 2005)).

## POINT 3

**The IHO properly held that the District failed to evaluate R.C. properly, resulting in an improper disability classification and inadequate IEP goals and programming.**

Crediting Parents' three experts and applying their unrebutted opinions to the record, the IHO held that the District failed to evaluate R.C. properly once it began the evaluation process.

---

[20] Other courts agree. *See, e.g., Lab'y Charter Sch. v. M.R.S.*, 2024 U.S. App. LEXIS 18172, at *4 (3d Cir. July 24, 2024) ("Lab Charter failed to remedy a situation where a child with a known disability had no IEP at all. We therefore agree with the hearing officer that the school's failure to develop and implement an IEP was a denial of FAPE that caused R.C. substantive harm, justifying an award of compensatory education.").

Specifically, he held: that the District failed to recognize signs that R.C. had attention deficit hyperactivity disorder (ADHD) (I-45-46); it failed adequately to assess his visuospatial deficits (I-46-47); and that it failed to evaluate him for learning disabilities in reading, writing and math (I-47-49). The result was that its ensuing May 2022 IEP, to be implemented in *third grade*, lacked sufficient evaluative data to offer R.C. properly individualized special education programming or accurate, measurable goals.

        **a. ADHD and Executive Functioning.**

After carefully reviewing her January 2023 report and observing her testimony, the IHO explicitly endorsed Parents' expert, Dr. Alyson Skinner, finding her report and testimony persuasive, credible, thoughtful, and comprehensive, and her diagnoses and recommendations "logical, coherent, and plausible." I-27, 46. He agreed with her that R.C.'s disability profile was far more complex than the District had realized, endorsing her finding that R.C. presented with a "nonverbal learning disorder." I-28 (citing DE140)."

Skinner also offered six pages of detailed programming recommendations, which the IHO summarized briefly and endorsed. I-27, 31 (citing D140-45). She stated that R.C. "will require comprehensive supports and services within the school setting to ensure his learning to potential." D140. While R.C. should be able to learn at grade level, "his neurodevelopmental nuances necessitate specialized approaches to instruction and provision of comprehensive classroom-based supports." D141. Fully adopting this analysis, the IHO concluded: "Despite the obvious signs of ADHD, the District did not account for it when it prepared Student's IEPs for second and third grades." I-45. He added: "[T]he District's failure to classify Student's disability as other health impairment prevented the District from creating an IEP that sufficiently described Student's

circumstances and thus made it impossible for it to determine what progress was appropriate and the services Student needed to make this progress." I-46.[21]

The SRO vacated this holding. Advancing an argument the District never made, he criticized the IHO for placing too much emphasis on R.C.'s eligibility classification (labels), writing, in pertinent part:

> Once a student has been found eligible for special education, the present levels of performance sections of the IEP for each student is where the focus should be placed, not the label that is used when a student meets the criteria for one or more of the disability categories. As a result, the hearing record does not support the IHO's finding that the district's evaluations and resulting educational programming recommendations did not adequately capture the student's needs related to his ADHD diagnosis or that the student's initial classification by the district as speech or language impaired deprived the student of a FAPE. SD33.

But the SRO misconstrued the IHO's holding. The IHO did not merely hold that the District misclassified R.C.; he held that the District's failure to gather enough information prevented it from writing a substantively appropriate IEP.  Had the District properly evaluated R.C. in the spring of 2022, it would have offered programming and accommodations individualized for R.C.'s unique executive functioning challenges, just as Dr. Skinner recommended. The IHO's analysis was about the substance of the District's IEPs, not just labels.

---

[21]Other health impairment (OHI) is a legal disability classification under the IDEA that encompasses ADHD and numerous other diagnoses. 20 U.S.C. § 1401(3)(A)(i).

**b. The IHO correctly held that the District failed to assess R.C.'s visuo-perceptual deficits and their impact on his progress. The SRO, without explanation, rejected Parents' experts' opinions in favor of less specific opinions from the District's witnesses.**

The IHO held that the District acknowledged but failed to follow up on R.C.'s visuo-perceptual deficits. I-46-47. He noted that, as part of District OT Paige Franco's April 2022 OT evaluation, on the Beery Buktenica Test of Motor Visual Integration, 6th Edition (Beery VMI), R.C. scored in the 13th percentile in visual motor integration and the 8th percentile in visual perception. I-16 (FOF ¶ 99). He cited Ms. Warnke's conclusion that R.C.'s visual perceptual abilities "may be impacting his access to the general education curriculum." I-46. Finally, he expressly adopted the conclusion of Parents' expert, Dr. Michele Bessler, that R.C.'s vision deficits "will interfere significantly with [his] ability to perform at his potential with reading, writing, copying and other academic activities." I-47 (citing PE142).

In another argument the District never made, the SRO held that the IHO erred in finding that the District failed to assess R.C.'s visuo-perceptual needs because: (i) Dr. Bessler provided no new information; and (ii) while Dr. Bessler and Dr. Skinner testified why the District's goals and programming for R.C.'s visuo-perceptual deficits were deficient, he believed the District's witnesses, who said the goals were appropriate. SD33, 35. This holding was illogical and factually wrong. *First*, everyone agreed that, in Spring 2022, much more information was needed about R.C.'s visuo-perceptual deficits and needs. The clearest evidence is a March 29, ***2023*** email from the District to Parents stating, in relevant part: "Based upon the visual processing deficits noted within the Beery VMI assessment, the team agreed that a vision evaluation may help to further inform [R.C.'s] educational program." The Beery VMI cited was Franco's report from *April 2022*. DE105. In other words, nearly a year earlier, the District already had enough information about R.C.'s visuo-perceptual issues to know that it needed more – but it did not act until March 2023.

There is therefore no plausible argument that, as of May 2022, the District had evaluated R.C. adequately to understand his visuo-perceptual needs.

*Second*, contrary to the SRO's assertion (SD-33), Dr. Bessler provided new and nuanced information about R.C.'s visuo-perceptual deficits.  Hers was the evaluation that the District conceded was necessary in March 2023. As the IHO explained, Dr. Bessler diagnosed R.C. with a convergence insufficiency, oculomotor dysfunction, accommodative insufficiency, and visual perceptual disorder. I-47.  These diagnoses informed her analysis of the District's third grade IEP goals.

*Third*, the SRO erred by failing to explain his decision to believe the District's witnesses over Dr. Bessler and Dr. Skinner – especially when the IHO repeatedly credited and endorsed them. Bessler testified authoritatively about why the vision-related motor skills goals in the District's third grade IEP were inadequate.  She explained that the motor skills goals did not address R.C.'s underlying visual perceptual deficits. T2487:21-2488:2. The "far-point copying goal" would not help R.C., because: "Well, you're asking him to do a task. You're not looking to develop the foundational skills required to do the task so it's like asking a person with a broken leg to walk without really doing anything for the broken leg." T2488:4-18 (discussing IEP Goal 13, DE29).  She had similar analyses for the remaining motor skills goals. *See* T2488:19-2489:5 (discussing IEP Goal 14, DE29); T2492:10-2494:16 (similar analysis for IEP Goals 13-16, DE45).

The District's OT witness, Ms. Waldvogel, testified that she did exercises with R.C. that addressed his visual scanning and tracking deficits. T2280:9-2283:25. But Dr. Bessler definitively refuted Waldvogel, explaining that the exercises would not have addressed R.C.'s underlying visual perceptual needs; they were more suited to a three or four year-old child. T2472:19-2474:13; Tr. at 2477:16-2478:19. Waldvogel said that tracking a moving ball was the same type of scanning

and tracking that a child does for copying a sentence. T2281:5-17.  Bessler again refuted her, explaining that tracking a ball is not a foundational skill for far-point copying. T2475:5-2476:12. Similarly, Dr. Skinner testified that the District lacked a full understanding of R.C.'s visuo-perceptual deficits and that its motor skills goals were not broken down sufficiently into components to be effective. T1758:16-1763:13. The IHO credited and endorsed Dr. Skinner's and Dr. Bessler's unrebutted, expert opinions and testimony. *See* I-27, 39, 47, 49. He also adopted Dr. Erin McDonough's testimony and recommendations that R.C. needed intensive writing remediation by a properly trained, doctoral level OT specialist. I-38 (¶ 249), I-52 (citing McDonough testimony, T2645-50).

After summarily rejecting Dr. Skinner's expert opinion, and apparently disregarding Bessler's critique of the District's motor skills goals, the SRO credited the far less specific, contrary testimony of the District's evaluating OT and *reading* specialist. SD35 (citing T2330-36, T632-33).  He never explained why he felt free to reject Bessler and Skinner's detailed and research-informed clinical analyses in favor of the less-experienced District's witnesses' less informed, conclusory statements.

Then, perhaps tacitly acknowledging that he was making unsupported credibility determinations in direct conflict with the IHO's credibility determinations, he made a surprising assertion (again, not advanced by the District): "[E]ven if the goals in question were lacking, ***such a minor deficiency***, in the context of the other goals and overall program developed for the student, would not demonstrate that the district denied the student a FAPE." SD35 (emphasis added).  The record does not sustain the SRO's declaration that the IEPs' "lacking" writing goals – the District's chief intervention for a child, like R.C., belatedly diagnosed with graphomotor dyslexia and dyslexic dysgraphia (I-49) – were a minor deficiency.

Since kindergarten, all of R.C.'s teachers had flagged his writing as a serious problem requiring intervention. After diagnosing R.C. with a Specific Learning Disability in Written Expression, Dr. McDonough opined, and was endorsed by the IHO, that R.C. needed at least one to two years of intensive writing remediation by a doctoral level OT specialist. I-38 (¶ 249), I-52 (citing McDonough testimony, T2645-50). No conscientious reading of this record could support the conclusion that R.C.'s writing goals were a "minor" part of his IEP.

Moreover, the harm caused by the District's failure to gather sufficient information about R.C.'s visuo-perceptual deficits went beyond inadequate writing goals. Lacking insight into how into R.C.'s particular visuo-perceptual and reading deficits, the District was unable to determine whether its chosen reading intervention for third grade, the Wilson Reading System (WRS), was appropriate for R.C. And this problem immediately played itself out in third grade (and thereafter). R.C. made "exceedingly slow" progress in his WRS lessons. T2642:13-17. According to Dr. McDonough and District's WRS teacher Elona Roth, a student will typically advance 2-3 full WRS steps per year. T1046:13-24; T2640:15-2642:6. R.C. began third grade at WRS Step 1.3 and ended at Step 3.1, but he was stuck at step 2.4 for two months. *See* DE359-63; T467:18-468:23. Recognizing that he was making slow progress, the District's *very* modest WRS goal for R.C. for the *end of fourth* grade (*i.e.*, in his *May 22, 2023* IEP) was only for him to reach Step 4.1, which addressed a skill covered in both first grade and second grade *Fundations*. PE78 (May 2023 IEP, Goal 1); PE201 (*Fundations* Level 1 Scope and Sequence); PE239 (*Fundations* Level 2 unit assessment with VCE marking); T1045:9-25 (Roth confirms that PE239 was covering VCE rule). He came nowhere close to meeting the goal.

Because the SRO did not grapple with any of this crucial evidence, his decision to disregard the IHO's credibility assessments and vacate his decision was insufficiently explained.  The Court should disregard it and defer to the IHO's detailed, well-reasoned decision.

### c. The IHO correctly held that the District failed to evaluate R.C. for learning disabilities and so failed to offer him appropriate programming. The SRO erred by reversing him.

Citing Dr. McDonough's testimony and report – which included extensive testing and diagnoses beyond what the District administered in the spring of 2022 – the IHO held that the District failed to evaluate R.C. for learning disabilities in reading, writing or math. I-47-49.  He further noted that the District erred as a matter of law when it asserted (through Dr. Spagnola and Ms. Warnke) that it could not classify R.C. as having a learning disability because he had not yet received MTSS (RTI) interventions. I-47 (citing T228-29, T232-33, T1552-53, T1527-28). He adopted McDonough's conclusion and diagnoses that R.C. had "a Specific Learning Disability [SLD] with impairment in Reading, moderate (dyseidetic dyslexia) and [SLD] with impairment in Written Expression, moderate (dyslexic dysgraphia). I-49. Based on this finding, he held that the "District's failure to evaluate R.C. for a learning disability, interfered with its ability to develop an IEP for Student that was reasonably designed to allow him to make progress that was appropriate in light of his circumstances." *Id*.

He then endorsed Dr. McDonough's programmatic recommendations, which included:

- Evidence-based multi-sensory reading instruction
- Prescribed vision therapy
- Multi-sensory strategies to emphasize sight-reading
- Specific direct instruction in morphology
- Evidence-based instruction in writing
- Writing goals in Student's IEP addressed through executive functioning supports
- Special education assistance to read and comprehend word problems, accurately express his answers in writing, and support in understanding visual information
- A comprehensive neuropsychological evaluation

The IHO awarded parents 120 hours of relief, at up to $200/hour, based on McDonough's recommendation that R.C. receive "reading and writing tutoring for 4-5 times per week to make up his deficit." I-39 (citing T2654-55); I-52-53. In sum, the IHO endorsed as credible and persuasive Dr. McDonough's unrebutted testimony, which established beyond any doubt (1) that R.C. had undiagnosed learning disabilities, and (2) that the District's failure to provide programming for those disabilities left him well behind his peers.

The SRO reversed the IHO's holding (in another argument the District never made) finding that Dr. McDonough's report and testimony added nothing new to what the District learned during its May 2022 evaluation. SD-33-34.  This holding is factually wrong.  As the IHO held, McDonough reviewed the District's Spring 2022 testing and concluded that she needed to do a "deep dive" into "the cognitive abilities that are related to reading" as well as a "diagnostic clarification" for R.C.  I-48. She administered several assessments that the District had not done, gaining a far better understanding of R.C.'s deficits than the District had developed.

Among Dr. McDonough's most significant takeaways was that R.C.'s writing deficits posed an even greater cause for alarm than his significant reading deficits:

> So I know that [Parents] originally referred R.C. because they were concerned about his reading, but what I indicated to both [parents] on several occasions is that, yes, I'm concerned about his reading, but I'm really concerned about his writing. You know, his writing is just very problematic, both from a graphomotor standpoint and from a spelling standpoint. So, you know, with regard to dysgraphia or a specific learning disability with impairment in writing, we can sometimes pinpoint a subtype.

T2644:9-22645:13. It was on this basis that she recommended, and the IHO awarded, equal compensatory relief for reading and writing.

The SRO clearly erred in finding that McDonough "did not reach a different conclusion than the district with respect to the student's deficits in reading and writing." SD34. If the District had reached the same conclusions as McDonough – that R.C.'s severe deficits in reading and

written expression both required immediate and long term, intensive tutoring, it would not have written an IEP that provided for three 40-minute periods of 5:1 group support in reading, and only two such group sessions per week for writing.  Instead, it would have recognized the severity of R.C.'s needs and proposed far more robust interventions, in line with McDonough's recommendations, and considered compensatory services to close the learning gaps over which they expressed concern at R.C.'s initial May 2022 CSE.

**POINT 4**

**The IHO correctly held that the District denied Parents participation in the decision not to provide compensatory services to R.C. The SRO vacated this holding with little explanation.**

During the May 19, 2022 initial eligibility CSE meeting, R.C.'s father (Mr. C) attempted to discuss whether R.C. was entitled to compensatory services in light of R.C. being so behind his classmates.  PE748:16-749:7. Dr. Spagnola immediately cut off the discussion by saying that comp-ed was "outside the realm" of permissible CSE topics. PE750:25-751:3. She added, incorrectly, that R.C.'s reading level "in the grand scheme of things," was "on grade level" and that his reading "wasn't even on the radar in terms of pre-referral AIS until you and Ms. Warnke spoke about the referral process…."  PE751:3-9.

The IHO held that Dr. Spagnola's conduct denied Parents meaningful participation in the May 19, 2022 CSE meeting:

> During the CSE meeting, Father sought compensatory services for Student. Dr. Spagnola declined to discuss this, stating that compensatory education was beyond what she could discuss at the CSE meeting. Dr. Spagnola admitted during her testimony that this was incorrect. In refusing to discuss compensatory services with Father during the CSE meeting, the District significantly impeded Father's right to participate in the decisionmaking process regarding the provision of a FAPE to Student and thus violated the IDEA.

I-51; I-21 (¶ 131). He was correct. In *E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 551 (S.D.N.Y. 2016), the court held: "The CSE may consider and reject the Parent's point of view, but

it may not deprive the Parent of meaningful participation by refusing to consider the Parent's concerns."

As the IHO found, at trial, Spagnola conceded that she realized just days later that she had "misspoken" in saying that the CSE was not the right venue to discuss compensatory services. T218:9-23.  Nevertheless, she never admitted her mistake to Parents, only acknowledging it at trial nearly a year and a half later**.** T218:21-219:4. As the IHO held, this was a straightforward, serious denial of FAPE. I-51.

The SRO rejected the IHO's finding, declaring that "the evidence in the record supports that the parents were afford [sic] meaningful participation in the creation of the student's IEPs." SD26. He added:

> With respect to the IHO's finding of a denial of FAPE because the May 2022 CSE failed to discuss compensatory services, even if I determined that this was a procedural violation, I do not find that it impeded the student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision making process, or deprived the student of educational benefits.

*Id*.  But how could Parents have participated in this decision where Dr. Spagnola unilaterally and unlawfully cut off discussion, soon realized her error, then refused for more than a year to admit or rectify it? In addition, Spagnola's assertion that R.C. was reading on grade level, and so compensatory education was not required, was objectively inaccurate – but was intended to deter Parents from continuing the comp-ed discussion. As to educational benefits, had R.C. received compensatory services, Parents could have used it to provide him remedial reading tutoring immediately.  Instead, the District falsely represented to Parents that his reading deficit did not warrant comp-ed, and he continued to fall further behind his peers.

The SRO's *ipse dixit* ruling ignores the record and is not well reasoned. The Court should reject it and reinstate the IHO's finding of a denial of FAPE for this serious procedural violation.

Parents requested that the IHO award a remedy of compensatory education for this serious violation. While he provided Parents a fair award of comp-ed, he did not allocate a specific portion of it to address this violation – perhaps because he had already awarded comp-ed to remediate R.C.'s reading.  "In enacting the IDEA, Congress did not intend to create a right without a remedy." *M.T. v. Arlington Cent. Sch. Dist.*, No. 22-CV-00437 (PMH), 2022 U.S. Dist. LEXIS 205272, at *19 (S.D.N.Y. Nov. 9, 2022)) (quoting *Streck v. Bd. of Educ. of the E. Greenbush Cent. Sch. Dist.*, 408 F. App'x 411, 415 (2d Cir. 2010) (internal quotes omitted)). Thus, whether a deliberate omission or an oversight, the IHO erred by not awarding compensatory education to Parents for the District's denying them meaningful participation.

Parents therefore respectfully request that the Court award R.C. appropriate compensatory relief for the District's refusal to consider his remedial needs in May and June of 2022.

## CONCLUSION

**WHEREFORE,** for the reasons stated in this memorandum, Parents respectfully request that the Court **GRANT** their motion for Judgment on the Administrative Record.

Dated: August 8, 2025                             Respectfully Submitted,
Plymouth, MA

/s/ Benjamin J. Hinerfeld

Benjamin J. Hinerfeld (BH 2180)
**LAW OFFICE OF BENJAMIN J. HINERFELD**
Attorneys for Plaintiffs
9 Stoddard Street
  Plymouth, MA 02360
1528 Walnut Street,  Suite 1100
  Philadelphia, PA 19102
447 Broadway 2nd Floor
  New York, NY 10013
Office (508) 591-0385
Cell (215) 694-7432
Fax (215) 689-2423
Ben@hinerfeldlaw.com